JOHN KELLY, *as Adm'r, &c.*, v. DETROIT BRIDGE WORKS.

NEGLIGENCE; CARE AND DILIGENCE; *Master and Servant; Demurrer to Evidence.* The plaintiff's evidence showed substantially the following facts: The plaintiff's intestate was a laborer in the employ of the defendant, assisting the defendant to build a bridge. Said intestate fell from said bridge, and was killed. The fall was caused by a heavy step of the intestate on a defective board or plank, causing the plank or board to break in the middle, and allowing the intestate to fall about twenty-five feet. This plank was a part of a scaffold. The intestate and his co-laborers had erected said scaffold on the very morning that said accident occurred. How this particular plank came to be placed in said scaffold, is not shown. There were plenty of good plank at the bridge from which to make a good scaffold. Whether any one knew, prior to the accident, or even suspected, that this plank was defective, is not shown. The evidence, so far as it went, tended to show that all the plank were tested before they were used. It was not shown that the defendant was negligent in any respect whatever. And no negligence was shown against any one, unless it may be inferred from the foregoing facts. The defendant demurred to the plaintiff's evidence, on the ground that it did not prove any cause of action against the defendant. The decision of the trial court, sustaining the demurrer, was correct, and is affirmed.

*Error from Doniphan District Court.*

JOHN CORBETT, an employé, engaged with others in constructing a bridge, was accidentally killed by falling from a scaffold, in February 1873, while in the employ of the *Detroit Bridge and Iron Works. John Kelly* was appointed admin-

istrator of Corbett's estate, and thereafter brought his action as such administrator to recover damages sustained by reason of the alleged "gross carelessness, gross negligence, and gross misconduct of defendant and its superintendent, while building the bridge aforesaid." Trial at the March Term 1874. Judgment for defendant, and plaintiff brings the case here.

*Price & Heatley*, *R. M. Vinyard*, and *W. D. Webb*, for plaintiff.

*W. W. Guthrie*, for defendant.

The opinion of the court was delivered by

VALENTINE, J.: This was an action of tort, brought by a foreign administrator against a foreign corporation for injuries to the plaintiff's intestate, claimed to have resulted from the negligence of the defendant, and resulting in the death of the plaintiff's intestate. The judgment of the court below was in favor of the defendant; and the plaintiff now brings the case to this court, and asks to have the judgment of the court below reversed. There are several questions raised in this case, but with the view that we entertain of the case, it will be necessary to decide only one of such questions. That question is, whether the plaintiff upon the trial of the case showed that the defendant was guilty of any negligence or not. There was no evidence introduced on the trial except that of the plaintiff. When the plaintiff rested his case the defendant demurred to the plaintiff's evidence, and the court below sustained the demurrer. Whether this ruling was correct or not, we think it is the only question which we need to decide. We think the ruling was correct. There was not a particle of evidence, as we read the record, tending to show that the defendant was guilty of any negligence. The facts would seem to be substantially as follows: The defendant, a corporation of Detroit, Michigan, was building a bridge across the Missouri river at or near St. Joseph, Missouri. Corbett, the plaintiff's intestate, was a laborer, assisting the defendant to build said bridge. The Missouri river was at that time

and place frozen over. Scaffolds were erected to assist the workmen in building the bridge, and Corbett fell from one of these scaffolds to the ice below, a distance of about twenty-five feet, and was killed. These scaffolds were made from pine boards, or plank, each board being about twelve feet long, twelve inches wide and two inches thick, and resting upon cross-ties, or other supports, about ten feet apart. It would seem that Corbett was standing on one of these boards, and that he stepped down from eighteen inches to three feet, and across horizontally from eighteen inches to three feet, to another board, and that this board broke about the middle and permitted him to pass on through and down to the ice. The board that broke was probably apparently sound and strong, but in fact it had two knots in it which rendered it to some extent weak, and caused it to break. There were plenty of good boards about the bridge with which to make good scaffolds, and which were intended for that purpose. The scaffold in which this board that broke was placed, was made that same morning by Corbett and his co-laborers. We shall now quote some of the evidence. Antoine Shoemaker testified among other things as follows:

"I was near by when Corbett fell off the bridge, and saw him fall. * * * I went down and assisted to pick him up. He was unconscious at that time. I never heard him speak after he fell. There were several hundred plank on the span he fell from. These planks were two inches thick, and from ten to twelve inches broad, and twelve feet long. They were pine planks. These plank were there for the use of the bridge, to walk on, and for any purpose they were needed for. The workmen shifted all these planks, the morning he fell, from one side to the other, where we wanted them. Before they were shifted they had been used for the sole purpose they were used after they were shifted. The plank broke near about the middle between the two ends. There was a knot in it where it broke. The knot was about three inches from one edge of the plank, and was from one-and-a-half to two-and-a-half inches broad. * * * Corbett and I were common laborers, doing the same kind of work. We did the same kind of work putting up the first span. At the time of the accident we had just about got the second span

done. Our work was mostly heavy work. We belonged to the gang of men who moved the plank for the workmen. The staging had been shifted by us about two hours previous to the accident. We had been using the planks for the same purpose up to the time of the accident. This staging was three planks wide. It was the same staging we used all the time, moving it ahead as the work advanced. * * * When we got the first span done we moved the staging forward to the second span, and the loose material to whatever place we wanted it. This was dangerous work we were at. Each man had to look out for himself. Some parts of the work were more dangerous than others. No man was made to go anywhere about the bridge where it was considered dangerous, so far as I know. If a man was ordered to go, and he thought it was dangerous, and would not go, some one else was asked to go. Sometimes I was asked to go out to places which I considered dangerous, and I would object to going, and the boss would ask some one else. Mr. Corbett helped to shift and put the staging in place that very morning, from another place on the bridge. The staging rested on the floor beams under the track of the bridge. * * * All the time we were on the bridge the bosses were urging the men to be careful. The bosses took pains not to have any of the men hurt. All the time I worked on the bridge, Corbett was the only one who met with an accident at this kind of work. John Wells, my foreman, was a very careful man, and several times went where I refused to go on account of the danger. Mr. Patton, our superintendent on that work, was a very careful man."

Washington Bennett testified among other things as follows: ·

"I saw Corbett fall from the bridge. * * * I tested some of these planks before they were put on the bridge. It must have been about one week before this accident that I tested the planks which were tested by me. I tested them on the ice under the second span. I was at work near one whole day testing plank. * * * At the time of the accident I was thirty-two years old, and weighed 232 pounds. I was about as stout and heavy as any man at work on the bridge. These plank I tested were brought from the first span. I understood they had been tested before they were used on the first span. The object of testing them before putting them on the second span, was, to see if they had suffered any damage while being used on the first span, before they were again used. The instruc-

tions of the foreman were, not to use any planks except those that were proven sound by actual test. The officers of the company seemed to be anxious about these plank, that none except good and sound ones should be used. I heard Mr. Robinson and Mr. Patton at different times say to the men who were putting up plank, not to put up any except good ones. I do not know whether the plank that broke was one of the planks I tested or not."

There was no evidence conflicting with the foregoing in any substantial particular. There was no evidence tending to show that any one knew, or even suspected, before said plank broke, that it was in the slightest degree defective. And the foregoing evidence is all the evidence that tends to show how said defective plank came to be placed where it was placed. It was evidently placed there by Corbett himself, or by some one of his co-laborers. And there is not a particle of evidence that tends to show that the defendant was guilty of the slightest negligence in the employment or retention of any of its agents or servants. Indeed, no negligence of any kind has been shown in this case on the part of the defendant, and it is doubtful even, whether any negligence has been shown on the part of any one. But even if any such negligence has been shown, it was on the part of the said intestate himself, or of his co-laborers, and therefore the plaintiff cannot recover in this case.

The judgment of the court below will be affirmed.

BREWER, J., concurring.

HORTON, C. J., not sitting in the case.