## The Kansas City & Pacific Railroad Company v. William Ryan.

1. Reasonable Care — *Safe Machinery.* Between the railroad company and its employés, the railroad company is required to exercise reasonable and ordinary care and diligence, and only such, in furnishing to its employés reasonably safe machinery and instrumentalities for the operation of its road. (*A. T. & S. F. Rld. Co. v. Wagner,* 33 Kas. 660.)

2. Tools—*Defects, Latent or Visible—Injury to Employé.* It does not necessarily follow that the special inspection given by a manufacturer, or, in a repair shop, by the expert ironworkers therein employed, to discover any latent or concealed defect in a tool or instrument for use, like a lifting jack, before the same is sent out for sale or use, is demanded by railroad companies, bridge builders, house raisers, or other persons using such a tool in their work; but, of course, a railroad company, and every other person, is liable for injuries to their employés from a defect in their tools and other appliances used in their work when such defect is visible or known, or might have been known by the exercise of reasonable and ordinary care and diligence.

3. Lifting Jack, *Defective—Negligence—Liability.* If a railroad company purchases an ordinary tool or implement, like a lifting jack, of a well-known and reliable dealer in such tools, and, at the time of the purchase, there is a latent or concealed defect therein, consisting of a defective weld of the foot attached to the jack, which is not visible, yet if, after use thereof by the railroad company, such jack, on account of its cogs being worn or broken, is sent in for repairs to the railroad shops of the company, and if, in repairing the jack, it was or ought to have been the practice at the shops, before the jack is sent out again for use, to examine and inspect all its parts to ascertain if any other defects exist necessary to be repaired, and any reasonable examination or inspection by the ironworkers at the shops would have disclosed the defective weld of the foot of the jack, then the railroad company is negligent in sending out from its own repair shops the jack for use in a defective condition, even if the defect is not visible.

4. Finding, *Unsupported—New Trial.* Where an important special finding of the jury, which would of itself be sufficient to sustain a verdict and judgment, is wholly unsupported by any evidence, and such special finding is the probable support for other important and material findings, and the verdict is against the great preponderance of the evidence, it is clear that the case was unfairly tried, and that a new trial should be granted.                                               —

*Error from Miami District Court.*

THIS was an action for damages for personal injuries received by *William Ryan* while working for the *Kansas City & Pacific Railroad Company* as a section hand $5\frac{1}{2}$ miles south of Paola, Miami county. The petition asked $7,000 judgment because of the negligence and carelessness of the defendant: (1) In not selecting a fit, sufficient and sound jack for raising railroad track; (2) and in not properly examining and inspecting said jack so sent and received for said work; (3) and in permitting said unfit, unsound and insufficient jack to remain provided and ready for use in said work, on account of which negligence a claw bar, thrown by the track's falling, on account of said jack breaking, was forced through the flesh and bones of plaintiff's cheek, rendering him unconscious, and causing him serious, painful and permanent injuries. The petition, by amendment, admitted that the doctor's and dentist's bills, and $30 in cash received of Beagle, claim agent of the railroad company, for nursing and medicines, had been paid or assumed by the company. The defendant, on August 12, 1889, filed its answer, in which it admitted (1) that it was a corporation, and that the plaintiff, while in its employ, working under its section foreman, was struck and injured by the claw bar as stated in the petition, quoting the language of that part of same; (2) denied all other allegations in the petition; (3) charged that in May, 1889, it settled with him by agreeing to keep him on the pay roll on full time till he was able to work, and pay his physician's bill, and $20 on his other expenses, and that it paid said $20 and fully complied with said agreement. August 20, 1889, Ryan filed his reply, consisting of a general denial. February 4, 1890, the railroad company filed an amendment to its answer, in which it alleged, *inter alia*, that the defect was unknown to the company, and, by reasonable diligence, could not have been discovered, and further alleged disobedience by the plaintiff of

the foreman's orders, but for which the injury would not have occurred. The amendment also denied all allegations of the petition it had not admitted. On the same day Ryan filed a reply, consisting of a general denial, to this amendment. Upon the trial, it was shown that the injuries to Ryan were occasioned by the breaking of a track or lifting jack, whereby a bar of iron was thrown against his face, breaking his upper jaw and cheek bone on the left side, bruising and lacerating the flesh, and injuring him so that he was confined to his bed and unble to work from the time of his injury, April 22, 1889, until the latter part of July following, when he again obtained work as a section hand, and continued in that employment to the time of the trial, having been in the meantime promoted to section foreman. There is no dispute that the section men, under the direction of the foreman, John Ratliff, were raising a frog with the jack and track bars. When they had raised it high enough, they stopped to enable the foreman to see whether it was in line, letting go of their bars, and thus throwing all the weight on the jack. The jack broke, letting the track drop suddenly, throwing one of the bars across the track, where it struck Ryan, injuring him as stated. This action was begun on May 21, 1889. The trial occupied four days, and resulted in a verdict of $5,000 for Ryan. The railroad company moved for a new trial, which was overruled, to which exceptions were taken. It prepared, and, on June 24, 1890, filed its petition in error and made case in this court.

*C. H. Kimball,* for plaintiff in error:

Many of the special findings of the jury were unsupported by any evidence, and were contrary to all the testimony in the case; others based upon a shadow of evidence were against the entire substance of the testimony from the witnesses on both sides of the case; others were evasive and not responsive to the questions; some were inconsistent with and contradicted others, and taken together they indicate that the jury was so

biased and prejudiced against the defendant as to render it incompetent to try the case fairly.

We submit that a new trial should have been and should be granted, for the following reasons: (1) Many of the special findings are unsupported by any testimony, and are contrary to all the evidence. (2) Some of the special findings are contrary to the entire substance of the testimony, and are so slightly supported as to come within the rule laid down in *A. T. & S. F. Rld. Co. v. Wagner,* 33 Kas. 660, 667. (3) The findings are inconsistent with each other. *A. T. & S. F. Rld. Co. v. Maher,* 23 Kas. 163; *Shoemaker v. St. L. & S. F. Rly. Co.,* 30 id. 359; *C. I. & K. Rld. Co. v. Townsdin,* 38 id. 78; *A. T. & S. F. Rld. Co. v. Woodcock,* 42 id. 348. (4) Many of the answers are evasive and irresponsive to the questions, and the court erred in not requiring the jury to answer them properly. *A. T. & S. F. Rld. Co. v. Cone,* 37 Kas. 567; *L. T. & S. W. Rly. Co. v. Jacobs,* 39 id. 204; *K. P. Rly. Co. v. Peavey,* 34 id. 473. (5) The answers are so evasive and unsatisfactory as to indicate that the defendant did not have a fair and impartial trial. *U. P. Rly. Co. v. Fray,* 31 Kas. 739.

The damages awarded are excessive and appear to have been given under the influence of passion and prejudice. We submit that, under all the circumstances of the case, the amount of $5,000 is so grossly excessive as to indicate of itself that the jury was influenced by passion and prejudice, and, taken in connection with the special findings, which show so plainly the animus of the jury, can lead to no other conclusion. *U. P. Rly. Co. v. Hand,* 7 Kas. 380; *M. K. & T. Rly. Co. v. Weaver,* 16 id. 456. In the Kier case, where the plaintiff, a railroad brakeman, 29 years old, lost his foot and part of his leg, a case of total disability for life, this court decided that more than $5,000 would be excessive damages. *K. C. F. S. & G. Rld. Co. v. Kier,* 41 Kas. 671. Comparing the two cases, and the relative condition of the two men, and $500 would be more than liberal compensation in this case.

The court erred in its instructions to the jury, and in refusing to give the instructions asked by the defendant. The jury were told, among other things, that they might award damages for mental suffering, not alone for the injury, and the bodily or physical pain which resulted from it, but also for the mental pain and suffering endured by the defendant, and for his disfigurement. The true rule in a case of this kind, based upon ordinary negligence, should be full compensation for all pecuniary loss which the plaintiff has or will suffer as the result of the injury. How much did the jury allow for mental suffering? No one knows; no one can tell. We have nothing to guide us. We think Greenleaf lays down the better rule, as follows:

"Injuries to the person or to the reputation consist in pain inflicted, whether bodily or mental, and in the expenses and loss of property which they occasion. The jury therefore, in the estimation of damages, are to consider, not only the direct expenses incurred by the plaintiff, but the loss of his time, his bodily sufferings, and, *if the injury was willful,* his mental agony also." 2 Greenl. Ev., § 267. See, also, *Johnson v. Wells,* 6 Nev. 224.

While the authorities are not harmonious on this proposition, yet we think, in cases of unintentional injury, where there is no malice, wantonness, or gross negligence, to allow the jury to award damages for mental suffering or for disfigurement — meaning only a scar on a man's face, as in this case, a scar so slight that the doctor had to look twice to see which side of the defendant's face had been hurt — is an unsafe rule, and does not tend toward the fair admeasurement of damages or the fair administration of justice in such cases.

*Jno. C. Sheridan,* for defendant in error:

The law regarding special questions to the jury provides that the court shall, upon the request of either party, submit to the jury such as are material. Code, § 286; 49 Kas. 672. The answers to such questions must be based upon competent evidence. Upon matters about which there is a conflict of

evidence, the answers are conclusive, if there is any evidence for them to rest on, because it is the province of a jury to determine the weight of the evidence, the credibility of witnesses, and the facts proven. See 48 Kas. 150, 384; 46 id. 170, 511; 30 id. 106, 172; 33 id. 404, 667; 49 id. 177, 672; 50 id. 645; 47 id. 247, 397.

As to railroads, the law is: "The amplest skill and circumspection should be employed in the construction and equipment, and the material and machinery should be subjected to the due tests." Bish. Non-Contr. Law, § 1024; 1 Shearm. & R. Neg., §§ 194, 196, 197. See, also, Bish. Non-Contr. Law, §§ 644, 645, 647; 14 Am. & Eng. Encyc. of Law, 893, 894; 30 Kas. 601, 607.

It is the duty of the employer to make the work of his employé as safe as reasonably practicable. 47 Kas. 315; 41 id. 165, 750; 37 id. 111; *Mo. Pac. Rly. Co. v. Dwyer,* 36 id. 58.

The complaint of the sixth instruction to the jury is entirely unfounded. If it were possible, in view of the other instructions, to suspect that the jury might have been misled by it, the numerous special findings made by the jury and requested by the defendant below show conclusively that they were not misled.

There was not a proposition of law that was applicable to the case that was not covered by the instructions given, and the company was not entitled to have them repeated, and was not entitled to the improper instructions asked by it. The court refused all instructions requested by both parties, and prepared the instructions that were given, which is a very safe practice. The findings show that neither the instructions nor anything else misled the jury.

There is no doubt and no question in this state of the rule as laid down by this court in 27 Kas. 544, in a case of personal injury by a defective sidewalk, where the court says: "That damages for mental suffering can be recovered in cases of this kind, where such mental suffering is an element of the physical pain, or is a necessary consequence of the physical pain,

and is the natural and proximate result of the injury." The instruction complained of permits the consideration of neither physical pain and suffering, mental pain and suffering, disability, or anything else, except "such as are the results of such injury." The authorities everywhere support the same rule. 2 Shearm. & R. Neg., § 758; 2 Redf. Rlys., § 304; 7 Am. Rep. 536, n. "The mental pain produced by an injury, on account of the apprehension felt for its result, as the disfigurement of the person, etc., may be considered by the jury." 5 Am. & Eng. Encyc. of Law, 42, n; 20 Am. Rep. 106.

There is another point raised, to the effect that the damages allowed are excessive. Kent lays down the rule that, to justify a new trial for excessive damages, they should be so excessive "as to strike all mankind, at first blush, as beyond all measure unreasonable and outrageous, and such as manifestly show the jury to have been influenced by passion, partiality, corruption, or prejudice." 2 Shearm. & R. Rlys. 199; 9 Johns. 45.

This court has repeatedly decided that, unless the damages are so excessive that it appears they must have been given under the influence of passion and prejudice, they will not be disturbed. "The mere fact that damages are excessive is not a ground for a new trial." 16 Kas. 456.

This court has in several cases properly decided verdicts to be excessive: That $10,000 is excessive verdict for loss of hand by yardman. 8 Kas. 647. That $5,000 for expelling person from train is excessive. 16 Kas. 456. That $6,500 for loss of thumb and right finger of employé is excessive. 29 Kas. 169. That $10,000 for amputation of leg of brakeman below knee is excessive. 36 Kas. 58. But it has also held that a verdict for $10,000 for loss of right hand of brakeman at wrist is not excessive. 19 Kas. 488. That $12,-000 for crushing a fireman's leg and foot so it had to be amputated was not excessive. 33 Kas. 298. The amount of suffering and other circumstances in that class of cases control the amount of recovery, but the amount of different verdicts

sustained in that class of cases leaves no room for attack upon the comparatively small amount allowed in this case, which is shown to be of a much more serious character.

The opinion of the court was delivered by

HORTON, C. J.: It is insisted that many of the special findings of the jury are unsupported by any evidence and contrary thereto; also, that the damages allowed at $5,000 are so excessive as to indicate passion and prejudice. The jury specially found that no officer, agent or employé of the railroad company knew of the existence of the defect which caused the jack to break, prior to the time it broke; that there was no evidence to show whether the foot broken from the jack at the time Ryan was injured was the same foot upon the jack when the company purchased it; and that it was customary on railroads generally to leave the inspection of tools used in track work to the section foreman. But they further found that the defect in the jack was visible before it broke, if it had been properly inspected.

It has been frequently ruled by this court, in accordance with the authorities generally, that an employé of a railroad company, by virtue of his employment, assumes all the ordinary and usual risks and hazards incident to his employment; that, as between a railroad company and its employés, the railroad company is not an insurer of the perfection of any of its machinery, appliances or instrumentalities for the operation of its railroad; that, as between a railroad company and its employés, the railroad company is required to exercise reasonable and ordinary care and diligence, and only such, in furnishing to its employés reasonably safe machinery and instrumentalities for the operation of its railroad; that it will be presumed, in the absence of anything to the contrary, that the railroad company performs its duty in such cases, and the burden of proving otherwise will rest upon the party asserting that the railroad company has not performed its duty; that, where an employé seeks to recover damages for injuries resulting from insuffi-

1. Reasonable care—safe machinery.

ciency of any of the machinery or instrumentalities furnished by the railroad company, it will not only devolve upon such employé to prove such insufficiency, but it will also devolve upon him to show either that the railroad company had notice of the defects, imperfections or insufficiencies complained of, or that, by the exercise of reasonable and ordinary care and diligence, it might have obtained such notices; that proof of a single defective or imperfect operation of any of such machinery or instrumentalities, resulting in injury, will not of itself be sufficient evidence, nor any evidence, that the company had previous knowledge or notice of any supposed or alleged defect, imperfection or insufficiency in such machinery or instrumentalities. (*Kelly v. Bridge Works,* 17 Kas. 558; *Railroad Co. v. Holt,* 29 id. 149; *Jackson v. Railroad Co.,* 31 id. 761; *Railroad Co. v. Wagner,* 33 id. 660; *Railroad Co. v. Ledbetter,* 34 id. 334; *Railway Co. v. Weaver,* 35 id. 434; *Railway Co. v. Dwyer,* 36 id. 69; *Railroad Co. v. McKee,* 37 id. 592.)

A critical examination of all of the evidence in the case, including that offered upon the part of Ryan, fails to show that there was any evidence introduced to support the finding that "the defect or flaw in the jack was visible before it broke, if it had been properly inspected." Involved with this finding are also the following findings: "That the railroad company was guilty of negligence in receiving the jack for use on its road, if it was received in the condition it was when it broke," and "that a man of ordinary skill and diligence, by the usual and ordinary inspection of the jack before it broke, would have been likely to have discovered the flaw or defect therein." It would necessarily follow that if the defect in the jack was visible before it broke, and if it existed from the time it was made, or from the time that the foot was attached or welded, that "the railroad company was guilty of negligence in receiving the jack," and, also, that "a man of ordinary skill and diligence, by the usual and ordinary inspection or examination of the jack before it broke, would have been likely to have discovered the defect." It

appears from all of the evidence that the broken foot was iron, and was fastened or welded to the steel bar of the jack by having the steel split and the iron inserted. The evidence was conflicting, whether the footpiece and bar were originally a single piece of steel, or whether a new foot piece had been put on the jack subsequent to its original completion. All of the witnesses, however, testifying upon the trial about this matter, stated that the foot was defectively and insufficiently fastened or welded to the steel bar. The pivotal question in the case, to charge the railroad company with negligence, was whether the company, by the exercise of reasonable and ordinary care and diligence, could have discovered the defect in the jack before it broke. The definition of "visible" is "perceptible by the eye; that may be seen; apparent; open; obvious." Of course, if the defect in the jack was visible before it broke, the railroad company was clearly guilty of negligence in furnishing it to its employés for use. In the absence of evidence to sustain the finding that the defect in the jack was visible, the other findings referred to and connected therewith may also be treated as of doubtful support to the verdict. As to whether such defect was visible before the jack broke, we refer to the following excerpts of the evidence, being all that was offered upon that point:

Ryan, the plaintiff below, testified:

"Ques. You had some experience on railroads before you worked on the Kansas City & Pacific? Ans. Yes, sir; I had worked some on the section.

"Q. And you had worked on the Kansas City & Pacific about three weeks before this happened? A. Somewhere about a month, I guess.

"Q. You commenced the 1st of April, did n't you? A. I do n't know exactly when I did commence.

"Q. And this happened on the 22d of April? A. Yes, sir.

"Q. This jack had been in use right along on track work during the time you were working on the railroad? A. Yes, sir.

"Q. Used every day and every hour in the day, almost, in

raising track?   A.  Yes, sir; there was a jack there all the time.

"Q.  That was what you were principally engaged in doing — surfacing road, and getting the track up in shape?   A. Yes, sir.

"Q.  So that it was necessary to use the jack about all the time?   A.  Yes, sir; the jack was used all the time.

"Q.  This was the only time it ever broke, to your knowledge?   A.  Yes, sir; I never saw the jack break before."

John Tomaine, called as a witness by Ryan, testified:

"Q.  How long had Mr. Ratliff had that jack with his gang?   A.  I think he had had the jack ever since I commenced to work there for him.

"Q.  That was how long before?   A.  I commenced to work for him probably in February, about the 1st, 1889.

"Q.  Then it was February, March, and April up to the time it was broken?   A.  Yes, sir.

"Q.  You never noticed any signs of any defect about the jack?   A.  I never paid any attention to it.

"Q.  I say you never noticed any?   A.  No, sir.

"Q.  What work were you engaged in most of the time when you were working for them on this section during the month of April?   A.  We were raising track.

"Q.  And surfacing?   A.  Yes, sir.

"Q.  This jack was the tool that was in use during that time, was it?   A.  It seems to me he had another jack there a while — sent it away along in the spring.

"Q.  Do you know whether this jack was on the work all the time?   A.  Yes, sir; the jack we had was there all the time until Mr. Ryan got hurt.

"Q.  Do you know whether it was this jack or some other jack?   A.  I couldn't say whether it was that jack for sure, or not.   It was something like that jack; I guess that is the same one; I couldn't say for sure whether that is the one or not.

"Q.  Was there more than one jack there at any time? A.  It seems to me like he had two there in the spring, and he sent one of them in."

J. S. Edwards, called as a witness by Ryan, testified:

"Q.  Did you notice this flaw in the metal at the time of the injury to Mr. Ryan?   A.  I did after the injury was done.

"Q.  How long had the jack been in use there by your

section men prior to that time? A. Ever since I had been there; I went on the 1st day of February.

"Q. And it had been used ever since? A. There was one jack, it was sent in for repairs; one of these cogs had been broken, and the piece was sent in for repairs, and it came back.

"Q. What had you been doing that day with it before this accident happened? A. We had been raising track south of the switch.

"Q. Been using it and making a good many lifts with it? A. Yes, sir; we used it right along; we had no other jack.

"Q. And you had been using it right along ever since you had it there? A. Yes, sir; what time it was there.

"Q. Did you ever notice that flaw in it before it broke? A. I never did; no, sir.

"Q. It is mostly on the interior of the metal, is n't it? A. Yes, sir.

"Q. Do you remember how often this jack was sent back for repairs? A. I do n't.

"Q. Do you remember any other repairs it needed at any time? A. No; I do not.

"Q. Did you ever notice any flaw in the jack? A. I did n't.

"Q. Did you ever make any inspection of it, or see anyone making an inspection? A. No; I never did."

Ed. Nelson, a section man on the railroad with Ryan, and called by him as a witness, testified:

"Q. Now, you say you have looked at this jack, generally, a good many times before it was broken. Did you ever see any signs of any defect about it? A. No, sir.

"Q. I will ask you if the defect that is there is n't almost entirely on the interior surface of the metal? A. I don't think it could be seen from the outside.

"Q. Before it was torn apart—broken? A. Yes, sir.

"Q. That is, you do n't think it could be seen before it was broken or torn apart? A. No, sir; I do n't think it could.

"Q. You never made any minute examination of the foot piece, to determine whether there was any flaws on it? A. I never put it on the car, and it was n't my business to use it, and I seldom handled it at all."

W. M. Kuykendall, called as a witness by Ryan, testified:

"Q. How long had you been on the work at that time?

A. I commenced about the 1st of January—somewhere along there.

"Q. Had this jack been there while you were at work? A. I do n't think this same jack had been there; but then, one something like it had been there.

"Q. Had any jack been sent back at any time?  A. Yes; if I remember right, the jack that was on the work when I went on the work was broken.   These little cogs here were broken out, and Ratliff kept it here and sent for another one, and when this one came he sent that one to Parsons, if I remember right.

"Q. You had been using the jack that day, had you?  A. Yes, sir.

"Q. And for a number of weeks previous to that time? A. I do n't know just exactly how long we had been using it, but I used the jack about all it was used.

"Q. I say, this jack had been in use a number of weeks previous to that time?   A. Yes, sir.

"Q. It was right under your eye when you used it?   A. Yes, sir.

"Q. You lifted it up and had it in your hands and handled it?   A. I carried it all the time.

Q. And in handling it, using it, and lifting it up, your eye must have fallen on every part of it at various times?   A. I won't say that it did.

"Q. What part of it do you think you never saw, or that your eye never fell upon?   A. I never examined the jack.

"Q. I will ask you if it possible for a man to use a tool and handle it day after day without seeing it?   A. It do n't look hardly like he could.

"Q. Do you think that you handled that tool and used it there—handled it day after day without seeing it?   A. I would n't say that I saw this part down in here at all every day.

"Q. What?   A. I would n't say that I saw this down here every day..

"Q. The parts that are hidden of course you did n't see; I do n't mean that; but the parts that are in sight you saw every day, did n't you?   A. I guess I did.

"Q. Of course you did n't see in back here [indicating] every day, because you did n't get down to look at it?   A. No, sir.

"Q. Did you ever see any signs or suspicions of a flaw in

the jack anywhere?    A.  No, sir; I did n't, that I remember
of, until after it was broke.    I noticed it the next morning
after it was broke.

"Q.  Do you know anything about this tool being looked
over by anybody else before its being used?    A.  Mr. Ratliff
always unlocks the tool box, and I suppose he—

"Q.  I do n't want any supposition.    If you ever saw Mr.
Ratliff look them over as if he was inspecting them, you can
say so, if you remember.    A.  I have seen him pick up his
tools and look at them.

"Q.  Did you ever see him inspect this jack?    A.  I have
seen him pick it up and look over it.

"Q.  Look over it for what purpose?    A.  I suppose to
see if there was any flaw or any break about it—cracks, or
anything of that kind.

"Q.  When did you see him do that?    A.  I do n't know
as I can tell you just when I saw him do it.    I saw him look
over his tools a number of times.

"Q.  Was it his custom to do that of mornings when he
took his tools out—not every morning, perhaps, but occa-
sionally?    A.  I think he did.

"Q.  You have seen him do it?    A.  I have seen him look-
ing over his tools.

"Q.  You have seen him look over that jack before this
accident?    A.  Yes, sir."

H. Llenk, called by Ryan as a witness, testified that he
was a blacksmith; that he had been engaged in that business
for 20 years at St. Louis and Paola, and that he had had ex-
perience generally in iron work.    Upon his direct examina-
tion, he testified, also:

"Ques.  You may state now whether a weld of that kind
could have been discovered by looking at it?    Ans.  I do n't
suppose it could after it was finished off.

"Q.  Would there be anything on the surface that would
indicate that that was a bad piece of workmanship—a bad
job, as you have designated it?    A.  I do n't know.    I do n't
think you could by looking at it after it was finished off,
probably; the way that has been ground off.

"Q.  Could you tell from the appearance of it now as to
whether or not it could have been detected by looking at it?
A.  No; I do n't think it could have been detected by look-
ing at it.    I do n't think it could."

Upon cross-examination, he further testified:

"Ques. The defect in this piece here is a defective weld, is n't it? Ans. Yes, sir.

"Q. And most of the defect is interior, out of sight? A. Yes, sir.

"Q. By the way, how does that surface there appear to have been finished? A. With an emery wheel, I suppose.

"Q. Where the surfaces are finished off on the outside with an emery wheel, it would simply make it all bright surface of the metal? A. Yes, sir.

"Q. Without showing anything? A. Yes, sir.

"Q. That is the reason you say to the jury you wouldn't think this could have been discovered by the eye after it was once finished off, is it? A. Yes, sir.

"Q. Your judgment is from the appearance of this you could n't have detected it with your eye — by the way this is finished down and so forth you couldn't have detected this with your eye? A. No, sir."

Charles Moran, called as a witness by Ryan, testified that he was a blacksmith; that he learned his trade in 1855; that he had worked at such shops for about 23 years in St. Louis, Armstrong, Kas., and in Kansas City, St. Charles, and St. Louis, Mo.; that he had had experience in the repair of railroad tools, and worked in that business in Armstrong for five years making claw bars, spike mauls, lining bars, and lever bars for raising track, etc. He further testified, in his direct examination:

"Ques. Would *you* have been able to know, by looking at that before it had been broken, whether or not that foot piece had been put on in the way you have stated? Ans. Yes, sir; you could see the scarfs, right here; you can detect that, or a man with a young eye, or with spectacles; you can see that scarf; there is a scarf loose that never was welded; I can see it without spectacles.

"Q. You may just explain to the jury in what ways a reasonable examination would have disclosed that that was defective, or would have disclosed that defect or flaw. A. I myself would have told it by seeing the scarfs on it here. I could have told it that way. It was never solidly welded, but the men that test it would do it with a hammer."

Upon cross-examination, he further testified:

"Q. Now, I will ask you if it is n't a fact that where two surfaces are put together — welded together like that — and two-thirds or three-fourths of the weld holds, and the iron is hammered or formed by the application of some force into shape, and then polished — not polished, but finished down with a file or emery wheel — I will ask you if you would always be able to see by your eye a flaw? A. Yes, sir; you see that scarf?

"Q. I see it now, because you can't get it together tight with your fingers. A. It could be seen anyhow when the iron was red.

"Q. I know it could be seen when the iron was red; that is, in the hands of the blacksmith. A. Yes, sir; in the hands of the blacksmith.

"Q. I do n't want to misunderstand you, Mr. Moran. What I am getting at is, after it has passed from the hands of the blacksmith, and after it has been finished down with an emery wheel or a file, whatever it might be, then would n't that make that all a bright surface of metal without showing any scarf? A. No; that scarf could have always been seen.

"Q. You think it could have always been seen there? A. Yes, sir; specially after it was either put on the grindstone or rubbed with a file.

"Q. You are not positive about that, are you? A. Well, by the *mechanic* it could be seen; I do n't say it could be seen by everybody.

"Q. It could be seen by a skilled worker in iron? A. Yes; I think it could.

"Q. He could detect that there was a joint there? A. That there was a scarf there."

On the part of the railroad company, James Turner testified that he was a blacksmith by trade, and had been so engaged for 28 years, 22 years of which were at Paola, where he lived at the time of the trial; that he had frequently welded bars of iron together, and also bars of iron and steel.

"Q. State to the jury whether, in your judgment, there would be any way, after that weld was put together and the iron finished down as it appears to have been finished, by which a man could detect the flaw that was in there, by inspection or observation. A. With the eye?

"Q. Yes. A. There is only one way known to me.

"Q. How would that be? A. That would be to heat it.

"Q. Describe to the jury how you might detect it in that way. A. You might heat this little part, for instance, altogether, and then as the heat traveled, if the surfaces was n't united here, you could see it; this would be dark, whereas there it would be red; consequently the heat would n't have traveled the same in that as it did in the other.

"Q. You would have to take it out of the jack and put it in the fire to do that? A. Yes, sir.

"Q. And would that in your opinion be the ordinary way of inspecting a tool that you had no suspicion of? A. No, sir; it would n't.

"Q. Do you think, then, that when this was in the jack in the first place there would be any indication before it was broken or torn apart by which anyone could discover that defect? A. I do n't think there would be, sir."

J. T. Fisher, called by the railroad company, testified that he was the roadmaster of the Kansas City & Pacific railroad at the time Ryan was injured.

"Q. Did you see this jack after it was delivered to Mr. Racliff, and before the time that William Ryan was hurt, and, if so, what was its condition? A. It appeared to be perfectly sound and in good order.

"Q. Was this flaw visible, or could it have been discovered by a careful examination of the jack before it was broken? A. It was not visible, and could not have been discovered by any examination of the tool before it was broken.

"Q. Why was it not visible? A. In making a weld, the two surfaces of metal are put together hot. If the metal welds over the greater part of the surface, as in this case, the part that is not welded may, by hammering or pressure, be fitted together so perfectly that no eye can see the defect, or distinguish it from those streaks or veins caused by the grain of the metal or by filing or finishing it. Most of the defect in this weld was in the inside of the metal, where it could not be seen, and most of the weld is behind the frame of the jack, so that no one could see much of the sides of the weld, and, for all of these reasons, nothing indicating a defect could be seen there until the surfaces were torn or broken apart, when the defect could at once be seen."

John Ratliff, the section foreman on the road when Ryan was injured, testified:

"Q. What did you do at any time in the way of inspecting this jack to see if it was sound or not? A. Well, I inspected my tools every morning.

"Q. What inspection, so far as the jack is concerned, did you give it? A. I always took the jack out of the tool box of a morning and loaded it on the car — examined it; always examined the footpiece of the jack every morning; that was my habit.

"Q. Examine the working parts of the jack? A. Yes, sir; very often.

"Q. And when you found it was in working order, what would you do? A. State that question again, please.

"Q. After you examined it, and found it in working order or proper order, then what would you do? A. Well, I put it on the hand car.

"Q. Was that flaw visible before the metal was broken and torn apart? A. No, sir; not with the eye; you could not see it.

"Q. Was there any way you know of whereby it could be detected before it was broken and torn apart? A. No, sir; I think not.

"Q. Just show the jury how you would inspect this jack when you went to take out the tools. A. [Witness shows jury] By working the jack, and picking it up and looking at it.

"Q. Hold it in your hands this way and look at it? A. Yes, sir.

"Q. State whether you could, by that examination, tell whether the jack was in good order or not. A. Well, I would think that if there was any flaw in it, I would see it.

"Q. If there was any flaw in it that was visible? A. Yes, sir.

"Q. And that, you say, you did every morning? A. Yes, sir.

"Q. Did you do it the morning before this accident happened? A. Yes, sir."

P. Rockwell, called by the railroad company, testified that he was the general roadmaster of the M. K. & T. railway; that he had been engaged continuously in the road department of railroad work for about 30 years; that the road de-

partment has charge of the roadbed, track, the managing and choosing of tools that was kept for that business; he also testified:

"Ques. I will call your attention to this fracture here where the foot or shoe of the bar is broken off, and ask you to state if, in your judgment, that fracture could have been discovered before it was broken or torn apart, by any usual or ordinary inspection of this tool? Ans. No, sir; I should say not; I don't see how anybody could have detected the defect that actually existed inside that iron previous to its use; that shows as though it had been in use quite a long time, I don't know how long, because that is all done by continued raising up against the bottom rail, and must have continued in use for some length of time; I don't think any ordinary inspection could possibly have discovered that, because it was entirely covered up and on the inside; I don't see that anyone could have peered into that and discovered the defect in it; I don't think it is possible; it couldn't have been done with the eye, as I could see.

"Q. Now, a portion of the flaw there you see seems to come to the surface. Where a portion of iron or metal is welded together as this seems to have been, over, perhaps, two-thirds of the surface — where a portion of it is welded together, and the rest of it is entirely closed up and then finished off with an emery wheel, would it be possible to detect the flaw in there? A. That is the reason I say it couldn't be detected, because the defects in there were entirely covered over before that fracture was made. The whole thing seemed to be one perfect piece, but at the same time there was a defect in it inside, and you see those edges down there are a feather edge and would have covered everything up. That is the same kind of defect that occurs in a thousand and one pieces of machinery where iron or steel is used for the make-up of the same."

The only witness, of all those referred to, who in any way intimated that the defect in the jack was visible before it broke is Moran. He admits that such defect could not have been seen by everybody, but stated that it could have been seen by a mechanic or by a skilled worker in iron. The jury specially found that it was not usual or customary for railroad companies to employ expert workers in iron or steel to inspect the tools in use on the road, and therefore, from

the evidence of Moran, it does not appear that the defect in the jack, before it broke, was visible, even if it had been properly inspected by a man of ordinary skill, prudence, and diligence. An experienced expert worker in iron like Moran might be able to detect with his trained eye a defect in a tool, when a roadmaster or a section foreman fully competent, and possessing ordinary skill, prudence and diligence for the performance of all of his duties, might not be able to do so.

The jury found that the jack was not manufactured by the railroad company. There was evidence tending to show it was purchased of M. M. Buck & Co., of St. Louis, Mo. If the company purchased the jack of a well-known and reliable house, with an established reputation as a dealer in railroad tools and supplies, and the defect was latent or concealed, so that no one but a mechanic or a skilled worker in iron could have discovered it by careful examination, the railroad company would not be guilty of negligence in furnishing the jack for use to its employés. Railroad companies are 2. Tools—defects, latent or not compelled to make a more careful or closer visible—injury to employe. inspection of a lifting jack than bridge builders, house raisers, or other persons, engaged in equally heavy work, furnishing such a tool for their employés. This tool is not a complicated one, but in general use, and no higher degree of care or prudence in the examination or inspection of the tool is required by a railroad company than of any other master or employer in like work. The same rule applies to all.

Moran, contrary to all of the other witnesses of both the plaintiff and the defendant inquired of upon the subject, testified that the defect in the jack could have been discovered before it broke, "by sounding it with a hammer." He also stated, that at railroad and other shops, where such tools are kept and repaired, "A man who is used to it takes a hammer and goes round, and, by tapping such a tool, can tell whether it is solid or not." This evidence was not followed up by showing, or offering to show, that with railroad companies, bridge builders, house raisers, or other employers,

that method of inspection is usual or customary.    An expert ironworker, with his trained ear as to the sound of iron or steel or other metals, might be able to discover defects or flaws in a tool or instrument manufactured or repaired by him that could not be discovered in the same way by other parties, not having like experience.    Two blacksmiths — one who testified on behalf of the plaintiff below, and the other, who was called by the company, and both of whom are experienced ironworkers — testified that the only way the defect in the jack could have been discovered before it broke was by "cutting off or unriveting the cap or top, and taking the bar out of the frame, and then striking it with a hammer or piece of steel or other metal."    This shows that among the ironworkers who were witnesses there was great contention whether the defect in the jack before it broke could have been discovered by tapping with a hammer or other instrument. But we need not pursue "the sounding of the bar by tapping" further, because upon another hearing other facts may be developed to show whether originally the bar and foot piece of the jack were one piece forged out of laminated steel, as claimed by Moran, or whether, after the jack was completed, it had, after its purchase, been subsequently repaired by having a new foot piece welded on.    Then again, the plaintiff may be able to show how such jacks are properly inspected after leaving the manufacturer, and while in the hands of a master or employer for use.

The necessary inspection by the manufacturer of a tool before it is sent out to be sold may not be the same inspection which is required or demanded by the master or employer in its use, if due care is used in its purchase.    There is some evidence in the record that the jack, on account of its cogs being worn or broken, was sent in for repairs to the railroad shops of the company at Parsons.    Now, if in repairing the worn or broken cogs of the jack, it was, or ought to have been, the practice at the shops, before the jack was sent out again for use, to examine and inspect all parts, to ascertain if any other defects existed therein, and any reasonable examin-

ation or inspection at the shops would have disclosed the defective weld of the foot, then the company would be negligent in furnishing from its own shops a defective jack for use, even if the defect in the jack was not visible, or even if after such repairs a man of ordinary skill, prudence and diligence would not, by any usual and ordinary inspection, have discovered the defect before the jack broke.

3. Lifting jack, defective— negligence— liability.

If the findings of fact were not contrary to the evidence, and if a finding had been made by the jury that the jack before it broke had been sent in for repairs to the railroad shops of the company at Parsons, on account of worn or broken cogs, or for any other reason, and that proper inspection had not been made in the shops before it was sent out again for use, such a finding would have permitted a recovery. But the case was not tried upon that theory. No instructions were given by the court or any questions submitted to the jury concerning a proper inspection of this jack at the railroad shops at Parsons, if sent in for repairs. Again, the evidence was conflicting whether the jack was sent in for repairs at all. See *Railway Co. v. Dwyer*, 36 Kas. 58, where the car to which the brake staff was attached had been repaired with a new body and new trucks, but the old brake staff, which subsequently broke, was permitted to remain. The further fact, however, appeared in that case that the defect in the brake staff was visible before it broke, if any examination had been made underneath the ratchet wheel. There are other findings of the jury not referred to which deserve criticism, but the findings discussed are the most important, and therefore it is not necessary at this time to comment upon the others.

In *Railroad Co. v. Jones*, 30 Kas. 601, there was a collision between hand cars violent enough to shatter the lifting handles of the car complained of. There was a crack in one of its wheels, and the wheels also wabbled. After the collision, there was no sufficient examination or inspection of the injured car. This court properly held:

"That the patent injury from the collision was so great

that common prudence required the most careful examination for latent injuries before further use of th e car, and none having been made, the company was guilty of negligence." That case was rightly decided, and we affirm all therein stated.

In addition to the other matters discussed, the verdict of the jury, in our opinion, is large, as it is admitted that the doctor's and dentist's bills of Ryan on account of his injuries were all paid by the railroad co mpany, and as it was shown that he went to work again as a section hand on another railroad about three months after he was injured, and was working at the time of the trial as section foreman, with increased pay.

It is unnecessary to comment upon the evidence or findings about the alleged settlement between Ryan and the railroad company. The evidence upon this matter is conflicting, and the jury were the sole judges of the weight and credibility of the witnesses. For the reasons given, we believe it is necessary that a new trial should be awarded, and, therefore, the judgment of the district court will be reversed, and the cause remanded for further proceedings.

4. Finding, unsupported— new trial.

JOHNSTON, J., concurring.

ALLEN, J., dissenting.