[No. 9464.  Department Two.  August 10, 1911.]

James Wilson, *Respondent*, v. Cain Lumber Company, *Appellant*.[1]

Master and Servant—Safe Appliances—Railroad Cars—Duty to Inspect. A lumber company operating a logging road and taking cars turned over to it by a railroad company to load on its own tracks, is bound to take notice of a defect in a brake rod that was patent or might be discoverable by the exercise of reasonable diligence, but is not liable for an injury to an employee by the breaking of the rod if the defect would not have been discovered by a reasonable inspection.

Same—Negligence of Inspection—Sufficiency. In an action for injuries to a brakeman through the breaking of a brake rod, a verdict for plaintiff is not sustained by any sufficient evidence that a

[1]Reported in 117 Pac. 246.

lumber company, taking a car with a defective brake rod from a railroad to load on its own tracks, could have discovered the defect by a reasonable inspection of the rod, where it appears that the rod broke under the application of physical force to set the brake, that the rod had been previously broken and welded at the same place, no witness saw the rod before the accident, and the sum of the expert evidence was that an inspection would have shown the weld and that there might have been a visible crack, and no custom or method of inspection was shown (DUNBAR, C. J., and CROW, J., dissenting).

Appeal from a judgment of the superior court for Whatcom county, Hardin, J., entered June 30, 1910, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained by a brakeman on a logging road. Reversed.

*Roberts, Battle, Hulbert & Tennant* and *Waters & Downer,* for appellant.

*Neterer & Pemberton,* for respondent.

CHADWICK, J.—Plaintiff was employed as a brakeman and fireman on a logging road operated by defendant. A spur about 1,100 feet long had been built from the main line to a landing, where logs were loaded on flat cars. The cars were furnished by the Northern Pacific Railway Company, and were by it switched onto a spur known as Casey's Spur, upon which they were picked up by defendant's crew. The spur first mentioned was of a temporary character, rough and unballasted, and was laid over a little knoll, the top of which was about 200 feet, or five or six car lengths, from the landing, as estimated by the witnesses. On the morning when plaintiff was injured, the crew, consisting of plaintiff and the engineer, were moving out three cars to be spotted at the landing for loading by the loading crew. On the top of the knoll there was a drop or a rough place in the track, so that, in passing over it, the cars became uncoupled from the engine and started down the track toward the landing. The engineer whistled a signal to set the brakes, and appellant

went to the end of the third car, being the head end as they were moving, for the train had been backed in, and undertook to set the hand brake. He took hold of the brake wheel and turned it so as to take up the slack, then, bracing his foot against the latch, he attempted to set the brake, when the brakestaff broke in two about eighteen inches from the top. Plaintiff's attitude was such that he lost his balance and fell in front of the cars, and in attempting to recover himself, was thrown under the car, so that the front trucks passed over his body, breaking his leg and injuring his left hand. The accident happened just as it was coming daylight. Plaintiff brought this action to recover damages, and from a verdict in his favor, defendant has appealed.

The only negligence relied on is the defective breakstaff. This had been previously broken and welded together. The theory of the plaintiff was most aptly summarized by his counsel when, at the close of the case, he asked permission to amend his complaint. We shall adopt his words:

"If the court please, we ask leave of the court to amend the complaint in this case so as to conform to the testimony in this: That there be added to paragraph 7 of the complaint, in addition to the improper weld and the other allegations in that paragraph, that the brakestaff had been broken partially at the place where it was attempted to be welded and that this break was open and apparent to the defendant and the defendant had notice of this break or should have known, and that this break in the breakestaff so weakened the brakestaff as to make it an unsafe appliance for the purpose for which it was designed and used."

That the brakestaff was defective is not denied; but defendant maintains that, the cars being turned over to it for a specific purpose by the Northern Pacific Railway Company, no duty of inspection rested upon it, and furthermore the defect was latent, and that an inspection would not have revealed the defect. Other defenses were set up, but they are in no way sustained by the testimony and will not be noticed. There is some contrariety of opinion as to the duty of a con-

cern engaged as defendant was to inspect cars turned over to it by another company; but while it is true that it is not a railroad in the strict sense, and has no shops or place or possibly means to repair, and has no property in the cars, we think the trial judge properly applied the doctrine of *Woods v. Northern Pac. R. Co.,* 36 Wash. 658, 79 Pac. 309. Appellant was using the car as an incident to its business, which in its nature involves a certain degree of hazard to life and limb, and some duty, to be measured by the circumstances of the particular case, rested upon it. Although in the *Woods* case the danger was held to be apparent, the court said:

"The duty rested upon appellant to inspect foreign cars to see that no hidden dangers, such as want of repairs, involved its employees; . . ."

And:

"It is the duty of the receiving company to inspect and guard against defects of the foreign car from lack of repairs, and which may not be open and apparent to the employee."

We do not want to be understood as holding that the duty of discovering hidden defects was upon appellant, for it was not; but only that the law is that it was bound to take notice of such defects as were patent or might be discoverable by the exercise of such reasonable diligence as the circumstances of the case demanded. For the high degree of care put upon a railway company, having its own cars and shops and men employed to do that service, should not be put on to one who merely loads or unloads the cars of another; and especially so when the employee is in a position to, and is presumbably competent to, detect ordinary defects. But where the defect is latent, a want of care will not be imputed to the employee, and only to the master in so far as the jury may find that ordinary diligence on his part would have discovered it. He is not to be held to be an insurer.

"Judicial holdings unite upon the proposition that the master is not liable for an injury to his servant, caused by

hidden defects or dangers in the machinery, appliances or premises furnished to the servant, when such defects or dangers were unknown to the master and were not discoverable by the exercise of that reasonable care and skill in inspecting them which has been already spoken of, and when there is nothing in external appearances to create a suspicion of their presence, . . ." 4 Thompson, Law of Negligence, § 3785.

Passing this point, we come to the main case: Has an omission of duty been shown. There had been no inspection, nor does it appear to have been the custom to inspect. While it is the duty of the master to inspect it is also the law that he will not be held liable if it is made to appear that a reasonable inspection would not have discovered the defect. In other words, unless the defect was patent "the master is not liable for an injury to his servant from the giving way of such a structure on which the servant is required to work, unless the master knew, or by the exercise of reasonable inspection might have known, of the defect therein; and this is especially true where the means and opportunity of inspection are equally open to the servant." 4 Thompson, Law of Negligence, §§ 3952, 4396. A patent defect is one that is open or which might have been discovered upon casual examination. These rules were known to respondent, and he has attempted to show that the defect was patent. The broken staff showed that it had either been improperly welded, or had been broken after being welded. This is indicated by the fact that an area of about one-fourth of the area of the fracture, and at about the center thereof, was bright, while the remaining surface was rusted and discolored, showing that the union was not perfect. Some witnesses swear that there was also a bright surface about the edges. No one saw, so as to testify to the appearance of, the staff before the accident, so that respondent resorted to opinion evidence to sustain his case. The staff was made of black iron, and there is testimony showing that there was some rust and scurf about the weld. All of the witnesses

agree that it is what is called a rough weld; that is, not smoothed down as is done in fine work; that the only way to test a weld is to strike it over an anvil or twist it, as the expression goes; that a rough weld does not indicate weakness in the iron, or that it is a bad job, one witness stating that it would indicate that the workman was satisfied with his job and not undertaking to cover anything up. So that we take it that, unless there was something apparent other than the weld, appellant would not be liable. Respondent undertook to prove that there was a patent defect in the staff. His principal witness, who on the next day saw the part that was broken off and through whom respondent sought to sustain this theory, testified, after describing the appearance of the broken staff, as follows:

"Q. You could see that it had been welded however? A. Yes, sir. Q. It shows it had been welded? A. Yes, sir. Q. Even above where it was broken it shows it was broken? A. Yes."

He then testified as follows:

"Q. What did you say with reference to that having been an old break there? A. Well, it might have been an old break. I can't just tell about that, but it looked like two different breaks. Q. Well, the morning that you looked at it I understood your testimony was that this darker portion was bright? A. Yes, sir. Q. This other side was an earlier break I understood it. Isn't that a fact? A. That is the way it looked to me that morning. Q. Conceding that to be true, what strength would that portion have if this side had not adhered and on the other side was cracked. That is what I want to know. Mr. Hulbert: Let me ask you a question. Q. (By Mr. Hulbert). The only information you got was from observation the next day? A. Yes, sir. Q. (By Mr. Hulbert.) Now are you able to tell the court and jury now from that observation whether or not there had been any former crack or break or whether or not it was merely a defective weld in that it did not adhere? A. Well, I would call it a defective weld. That is my opinion on it. That break looked to me then and does yet, as though part of that was broke before. Q. (By the Court): You mean before it was

welded? A. After it was welded, it looks as though that break there was broke just within this last break? Q. (By the Court). Now, let us understand that. You claim there was one part that never did weld; one part that was broken, and one part that was left. In other words three different conditions of metal? A. Yes, sir. Q. (By Mr. Pemberton). This broken part was the last break; a new break? A. Yes, sir."

The witness was thereafter recalled and, omitting the colloquies of counsel, the following question was asked:

"You testified concerning that brakestaff there as to its not being welded on one side and being cracked on the other and a person near the brakestaff looking for—inspecting it, would it be discernible, easy of detection?"

After some objections and argument, the question was restated:

"You have testified as to the condition and appearance of this brakestaff, exhibit A. From that would it be discernible—any one inspecting the brakestaff?"

The court said:

"I will permit him to testify as an expert. I think if he can tell as an expert from this particular exhibit whether or not he can determine from that whether or not there was an apparent defect, why he can say so and if there was not he can say so. I believe he could be permitted to do that, but it should be confined to the examination of this particular piece of iron."

Whereupon the witness answered:

"Well, it looks to me as though it could have been told. Broke on one side and not welded on the other."

The witness had already testified:

"Q. And the appearance of a weld depends upon the way it is finished off, does it not? A. Yes, sir. Q. Some men will hammer a weld together and leave it rough and a little larger than the rest of the piece and others will pound it down or file it off and finish it and make it smooth? A. Yes, sir. Q. So that, outside of the appearance of the weld, whether it is

good or bad, depends upon the workmanship of the black-smith in finishing it off? A. Yes, sir. Q. Then I under-stand you to say, Mr. Isaacson, that it would be impossible to tell what the condition of the weld was from a mere in-spection or looking from the outside without taking a ham-mer or something of that kind for the purpose of testing it? A. It is pretty hard to tell on the inside, how it was."

And thereafter:

"Q. Mr. Isaacson, you never saw this brakestaff before the accident did you? A. No, sir. Q. You never saw the other end of the brakestaff, did you? A. No, sir. Q. The only thing that you ever saw was this piece? A. Yes, sir. Q. You don't know just how it did fit on the other piece, do you? A. No, sir. Q. You cannot tell, and never did know, just how smooth it fit on the other piece, do you? A. No, sir. Q. You don't know whether there was any crack visible there or not? A. No, sir. Q. You don't know and cannot state whether or not there was a break there that could have been seen, do you? A. No, sir; not from that piece. Not only from that piece. Q. You merely guess from that piece that one side was cracked? A. Yes, sir. Q. And you say that that was rusty? A. Yes, sir. Q. Now, you don't know what the condition was or the appearance was as the time of the accident? A. No, sir. Q. You don't know—in other words, you don't know what the appearance of the brakestaff was at that time? A. No, sir. Q. You don't know whether any one there looking up and down that brakestaff could have seen that crack or not, do you? A. No, sir. Q. At that time? A. No, sir. Q. If it was cracked, you don't know when or how is was ever cracked? A. No, sir. . . . . Q. The mere fact that a rod is welded and you can see that it is welded wouldn't make you feel that it was weakened on that account, would it? A. No, sir. Q. Very frequently if a weld of that kind is properly adhered and properly done, the brakestaff would be just as likely to break somewhere else as to break there, wouldn't it? A. Yes, sir. Q. So that if you would see a weld, an ordinary weld on a brakestaff, you would not feel that it should be condemned because of that fact, would you? A. No, no not just because it was welded. Q. If the weld was of ordi-nary appearance—if you thought about it at all, you would

think that it might break in some other place just as quick as in that weld? A. Well, it all depends on how it looked. Q. Well I say of the ordinary appearance? A. Yes. Q. So far as you know, this weld was of an ordinary appearance; as far as you know? A. Yes."

And on reexamination:

"Q. Does this look like an ordinary weld? A. Yes. Q. It looks like an ordinary weld? A. Yes. Q. What do you mean by ordinary? A. Well, from the outside. Most all welds unless they finish them off closely, they have a scurf on there where they draw them down to weld. Q. You testified that this would have been readily detected; this weld in the condition that you found this in then? A. Well, the way it looked to me from that break, you could tell the break —that is what I testified to, that the break would usually be better than the weld would. If the weld was perfect there— as I stated, it is pretty hard to tell how they are on the inside. But this break in there on the outside, I would imagine a person could see it. Q. The old break, you are talking about? A. Yes, sir."

And on recross-examination:

"Q. That is just exactly what you meant when you said you thought that it might be seen? A. Yes, sir. Q. Not on account of the weld? A. Yes, sir, the break. Q. But on account of the crack that you thought might have existed in the brakestaff? A. Yes, sir. Q. And all of your testimony was upon the assumption that there was a crack there and that the crack was open so that it could be seen? A. Yes."

And in answer to a question propounded by the court:

"I want to know whether or not you say that there was a crack or was not a crack? A. From the way it looked to me when I first seen it, I would say that there was a crack there."

This is the strength of respondent's case, although another witness gave somewhat similar testimony. Upon a motion for a directed verdict, the trial judge was of opinion that:

"If that witness told the truth with reference to how much was still attached to that brake, the two pieces, it would have

been a very easy matter to have found out that that brake was about in two. Now should the defendant have taken hold of it or inspected it in some way except by passing along and looking at it. Now, your argument proceeds upon the theory that a man going along there could not have seen that crack. Is that enough? Is that what an ordinary man would do? Isn't it a question of fact for the jury to say from what was the general method of how men do in those matters of human affairs?"

But we think the court erred in assuming that the rather doubtful opinion of the witness was sufficient evidence that there was a crack in the brakestaff, or that, if so, it could have been noticed. He well says: "Is that enough" etc.; but there is no evidence to show what was a general method, or whether there was any method other than observation, or whether any other method would have been practical. The verdict of the jury must find some basis in the evidence. They are not permitted to speculate or say what might have been; nor is a witness to be allowed to speculate or theorize, and from his own hypothesis, express an opinion of what might have been, and pass it as original evidence. Neither the witnesses nor the jury are permitted to guess as to whether the defect was hidden or not, or to presume negligence from the happening of the accident.

"Moreover, it is not enough to prove the existence of a defect at the very moment of the accident, but it must also appear that the master had an opportunity of previous knowledge, or that the facts were such that he might, by the exercise of the proper care and diligence, have known of the defect. Hence, although a railroad company has no right to assume that cars received from another company are in a safe condition, but is under the duty of inspecting them before requiring its servants to handle them,—it is not liable for injuries to a brakeman from the breaking of a brakestaff upon such car through an old crack, which could only have been detected by taking the staff off the car and striking it with a hammer, where there was nothing in the appearance of the car indicating that it needed repairs; nor for injuries to a brakeman by the giving way of a brake-rod in which

there was an old crack, which could be discovered only by taking out and lifting up the brake-rod, and which is not apparent upon any inspection made in accordance with the universal custom of well-conducted railroads, in the absence of anything that would suggest, to the mind of a reasonably prudent person, a necessity for so lifting or taking out the brake-rod." 4 Thompson, Law of Negligence, § 4398.

In *Read v. New York etc. R. Co.,* 20 R. I. 209, 37 Atl. 947, it is said:

"According to the testimony, the defect in the brake-rod, by the breaking of which the plaintiff was injured, consisted of a flaw due to the imperfect welding of the two pieces which composed the rod. The evidence on the part of the defendant tends to show that the flaw was not discoverable, owing to rust on the rod, by the usual methods of inspection. There is no evidence on the part of the plaintiff to rebut this, for, *though the plaintiff testifies that the defect would have been discernible by the eye if it had been daylight, it is evident that this statement is merely his inference from the fact that the brake-rod was so easily twisted off in his attempt to set the brake.* If the defect was not discoverable by the customary modes of inspection, or, in other words, was a latent defect, the defendants were not guilty of negligence, and consequently the verdict was against the evidence on this point." (The italics are ours.)

See, also, *Louisville & N. R. Co. v. Campbell,* 97 Ala. 147, 12 South. 574; *Sack v. Dolese,* 137 Ill. 129, 27 N. E. 62; *Grant v. Pennsylvania etc. R. Co.,* 133 N. Y. 657, 31 N. E. 220.

The sum of the testimony was that an examination would have revealed the fact that there had been a weld, for the witness said: "Q. You don't know whether there was any crack visible or not? A. No, sir," and that he did not know the appearance of the staff at the time of the accident. All he says is that there might have been a visible crack, and if so, it might have been seen upon inspection; but no witness undertook to say that there was any custom or manner or method of inspection prevailing among those who take cars to load or unload. So we must assume that a mere looking

the equipment over would have been sufficient. Otherwise, we would have to hold, as an arbitrary proposition of law, that every shipper who loads or unloads the cars of a railway on his own spurs or tracks is bound to the same rigid duty of inspection that the law puts upon the railroad itself; or, to put it in other words, to employ men for that service alone. A witness was offered to show custom, but proved himself without knowledge, and his examination was not pursued further.

The jury had no standard with which to weigh the evidence. Their verdict was necessarily speculative, for there is no basis for it other than the inference of the witness, drawn from a hypothesis which he admits is based upon pure conjecture. We cannot assume, in the absence of direct evidence, that the jury can say: "What was the general method, of how men do in such matters of human affairs?" It may be that the general method would put the burden of inspecting cars, put to only a temporary use, on the train crew; or it may be, as in the absence of testimony we have assumed it to be, on the master to the extent of discovering obvious defects. It may be that respondent has a lawful demand, and that upon a retrial, he may prove it by competent evidence.

This case is accordingly reversed and remanded for a new trial.

ELLIS and MORRIS, JJ., concur.


CROW, J. (dissenting)—Respondent, in the regular course of his employment, attempted to use an appliance provided by his master, and without fault or negligence on his part, was injured by reason of the appliance breaking. It should not be assumed that the only necessary or feasible method of inspection would be to look at the brake-rod for obvious defects, ignoring nonobvious ones that might also exist. The brake-rod could have been further tested and inspected by some practical method which would have subjected it to as much resistance and strain as it underwent when used by re-

spondent.   If the physical force which respondent applied when attempting to set the brake was sufficient to reveal the defect and cause the accident, it would seem that a like quantity of force, previously applied upon inspection, would have caused a timely discovery of the defect.   I think the questions whether the defect could have been discovered by a proper inspection, whether such an inspection had been made, and whether respondent assumed the risk, were for the jury, and were properly submitted for their consideration.

I therefore dissent.

DUNBAR, C. J., concurs with CROW, J.