[No. 15481.   Department One.   April 5, 1920.]

HENRY W. STEVENS, *Appellant*, v. WALKER D. HINES,
*Director General of Railroads, Respondent.*[1]

APPEAL (468) — REVIEW—HARMLESS ERROR—FINDINGS BY COURT.
A decision that plaintiff at the time of his injury was not employed
in interstate commerce, is harmless where the rule of liability was
the same under the state statutes as under the Federal employers'
liability act, and no issue was raised thereunder.

MASTER AND SERVANT (35, 145)—NEGLIGENCE—DEFECTIVE APPLI-
ANCES—SIMPLE TOOLS—EVIDENCE—SUFFICIENCY. A railroad company
was free of negligence, as a matter of law, in furnishing a hose
coupling wedge alleged to have been too brittle, where it purchased
many thousands of such wedges from a reliable concern, all of
uniform design and appearance, none of which had ever proved
defective before, the wedge being a very simple appliance.

Appeal from a judgment of the superior court for
Spokane county, Hurn, J., entered April 12, 1919, upon
granting a nonsuit, dismissing an action for personal
injuries sustained by an employee struck by a piece
of steel while driving a wedge.   Affirmed.

*Lawrence H. Brown*, for appellant.

*F. V. Brown* and *Thomas Balmer*, for respondent.

PARKER, J.—The plaintiff, Stevens, commenced this
action in the superior court for Spokane county, seek-
ing recovery of damages for personal injuries which
he claims to have suffered while employed as a sta-
tionary engineer in the passenger car yard steam heat-
ing plant of the Great Northern Railway Company, in
Spokane, while the lines of that company were under
the control of the defendant as United States director
general of railroads.   The case proceeded to trial upon
the merits before the court sitting with a jury.   At the
close of the evidence introduced in chief in behalf of

[1]Reported in 188 Pac. 917.

the plaintiff, and at the close of all of the evidence, counsel for defendant, by appropriate motions, challenged the sufficiency of the evidence to support any recovery by the plaintiff, asking the court to withdraw the case from the jury and render final judgment accordingly. The court ruled upon both motions at the close of all of the evidence, sustaining the challenge to the evidence so made, withdrew the case from the jury, and rendered final judgment denying recovery as prayed for. From this disposition of the cause, the plaintiff has appealed to this court.

At the time appellant was injured, he was an experienced steam shovel engineer. During the winter months, because of the suspension of steam shovel work, he was employed as engineer of the steam heating plant in the passenger car yard of the Great Northern Railway at Spokane. His duties consisted of keeping steam up for the purpose of heating passenger cars while they were standing in the yard preparatory to being put into trains to go out upon the road. His duties, among other things, required him to connect and disconnect steam hose of the cars with the steam hose of the plant, and also to connect and disconnect steam hose between cars. The hose connections between the cars are made secure by the driving of steel wedges into slots, a machinist's hammer, weighing about two and one-half pounds, having a short handle and suitable for use with one hand, being furnished for that purpose. The wedges are three and three-fourths inches long, with heads one-half inch by three-fourths inch in size. They constitute a part of the hose coupling appliance, and remain in the slots made for them, even when the hose is disconnected and not in use. There is one such wedge in the coupling at the end of each hose, hence two wedges are used in making the connection secure. The wedges, when the

couplings are disconnected and not in use, are loosely held in place in their slots ready for driving, by a slight widening of their points. At about 11 o'clock of the night in question, appellant was required to connect the hose couplings between two cars. His only light was a somewhat dimly burning lantern. The position in which he was compelled to work on the track between the cars was somewhat cramped as usual. Having attached the coupling together, he proceeded to drive the two wedges in to make the connection secure. While driving one of the wedges, there was, as he claims, thrown into one of his eyes, immediately following a blow with the hammer, a piece of steel, which flew off the edge of the head of the wedge as a result of the blow. This occurred, he claims, because the head of the wedge was improperly tempered, in that it was too hard and brittle to be safely used for that purpose. The injury to his eye, so occasioned, is that for which he here seeks recovery. The negligence upon which he rests his claim of recovery is alleged in his complaint as follows:

"That the said steel wedge which plaintiff was driving with a hammer as aforesaid was of poor quality, very brittle and liable to chip and cause injury to anyone driving the same, all of which conditions were well known to the defendant, but were unknown to the plaintiff and could not have been known by him by the exercise of reasonable prudence. That the fact that the said appliance was of poor quality for the purpose, and brittle and likely to chip and break, could have been ascertained by defendant by a proper inspection thereof."

In the rendering of judgment of dismissal, the trial judge recited therein his conclusions as follows:

"(1) That the evidence showed that the plaintiff, at the time of his injury, was not employed, nor the defendant engaged in interstate commerce within the

meaning of the Federal employers liability act, but that defendant was not entitled to have its motion granted on that ground for the reason that the amended complaint states a cause of action under the laws of the state of Washington, upon which a recovery could be had in this action upon a showing of defendant's negligence, disregarding the allegations that plaintiff was employed in interstate commerce at the time of his injury;

"(2)   That the evidence failed to show any negligence on the part of defendant, either under Federal or state laws;

"(3)   That the evidence showed that plaintiff assumed the risk of said injury."

There was no evidence introduced in behalf of appellant tending to show that respondent or his agents had any knowledge of the wedge in question being unsuitable for the purpose for which it was being used, because of it being too hard or brittle, rendering it liable to chip when struck upon the head. The question of respondent's negligence, therefore, seems plainly to be limited to the question of the measure of his duty of inspection, through his agents, of the wedge in question before authorizing its use in the coupling. The record disclosed no conflict touching what we conceive to be the controlling facts upon this question. They may be summarized as follows: These couplings, including the wedges, which we have already noticed are a part thereof, were made by the Gold Car Heating & Lighting Company. This is a very large and very reliable concern engaged in the manufacture of all kinds of steam heating appliances. The type of coupler here in question has been sold and furnished by this company to the Great Northern Railway Company for some years past, and also to fifteen other railway companies in the United States. There have been sold and furnished by the Gold Car Heating &

Lighting Company to these railway companies some .
fifty-five or sixty thousand couplings of this particu-
lar type, which means over a hundred thousand wedges
as parts thereof.   There are some 2,400 of these
couplings in use on the passenger cars of the Great
Northern Railway Company.   There was no evidence
introduced on behalf of appellant tending to show that,
upon the striking of the head of a wedge, in making
hose connections with this type of coupler, any par-
ticles of steel had ever been thrown off because of the
hardness or brittleness of the head of any wedge, save
upon the single occasion when appellant was injured.
The testimony of the agents of the Great Northern
Railway Company and the agents of the Gold Car
Heating & Lighting Company, whose duties were such
that, had any such defect in the head of any wedges
ever been so made apparent, it would have come to
their attention for correction, testified that they had
never heard of any such defect in any wedge.   The
wedges were all made by a uniform process, and tem-
pered so as to make their points comparatively soft,
and their heads harder, but not brittle, so that the
heads will be more of the nature of tool steel.   This
is to prevent "mushrooming," as it is called, from the
blows of the hammer when being driven.   The ap-
pearance of the wedges, a number of which are in evi-
dence, both new ones and others which have been in
use, plainly indicate that they are made in such manner
as to result in uniformity of shape and appearance.
The couplers, with their wedges in place, which were
the ones being connected by appellant when he was
injured, are in evidence in this case, and the wedges
therein are in perfect condition in outward appearance,
even their heads showing but little evidence of having
been struck with a hammer.   There is a nick in the
head of one of them from which, we are assuming for

argument's sake, it may be inferred that the small piece which injured appellant had been broken.

It is first contended that the trial court erred, to the prejudice of appellant, in deciding that he was not, at the time he was injured, employed in interstate commerce. We have not noticed the evidence touching this question, because we are convinced that the decision of the trial court thereon, even though erroneous, was not in the least prejudicial to the appellant's legal rights here involved. Enough has already been said to show that there is not here involved any question of negligence of any of appellant's fellow servants, or any question of his own contributory negligence, to be decided in the light of the Federal employers' liability act. Nor is there any question of respondent's alleged negligence growing out of the violation of any Federal statutory duty to be performed by operators of railways which, under that act, would remove the burden of assumption of risk from an employee injured as a result of the violation of such statutory duty.

Counsel for appellant does not advise us just what advantage would accrue to him in the trial of the case by having it decided that he was, at the time he was injured, employed in interstate commerce. It does not occur to us that an injured interstate commerce employee could have any advantages under the Federal employers' liability act other than those growing out of the abolishing of the fellow servant doctrine by that act, the modification of the general rule as to contributory negligence by that act, and the removal of the burden of assumption of risk, where the injury is the result of a violation of some Federal statutory duty by that act. (3 U. S. Stat. Ann., pp. 401, 463, and notes). It is true that the question of appellant assuming the risk of his being injured as he was, is in-

cidentally involved with the question of respondent's negligence; but it is not claimed, indeed there seems no possible show for claiming, that respondent's alleged negligence here involved was the result of the violation of any statutory duty on the part of respondent or his agents; and it has been well settled law that the elimination of the defense of assumption of risk by the Federal employers' liability act, when the negligence is the result of a violation of a statutory duty, leaves the law of assumption of risk unchanged when the negligence in question does not grow out of the violation of a statutory duty. *Central Vermont R. Co. v. Bethune*, 206 Fed. 868; *New York, N. H. & H. R. Co. v. Vizvari*, 210 Fed. 118, L. R. A. 1915C 9; *Seaboard Air Line R. v. Horton*, 233 U. S. 492, Ann. Cas. 1915B 475. What we have said upon this subject has been without reference to our own statutes, but it may be noted that, by our own statutes, the law of appellant's right of recovery in this action is exactly the same as under the Federal employers' liability act. Laws of 1917, p. 96; *Archibald v. Northern Pac. R. Co.*, 108 Wash. 97, 183 Pac. 95.

It seems quite plain to us that the question of appellant's assumption of risk in this case is to be decided wholly independent of state or Federal statutory law, for the simple reason that there is no statutory law touching the question of assumption of risk as that question is here presented. It would seem that the only substantial reason that appellant could have for alleging and having it determined that he was employed in interstate commerce when injured, would be to enable him to bring his action in the Federal instead of the state courts. This right, of course, he has waived by bringing his action in the state court. We are of the opinion that there was no prejudicial error committed by the court in deciding that appel-

lant was, at the time of his injury, not employed in interstate commerce, even though, in so deciding, the court was in error.

The principal contention here made in appellant's behalf seems to be that respondent was negligent in furnishing him with an unsafe appliance to work with, in that the wedge was unsafe for its intended use because of its being too hard and brittle and thus rendered unsafe, and that respondent's agents should have learned of such defect and unsafe condition of the wedge by proper inspection. The measure of the duty of the master to the employee in this regard is not that of an insurer, but only that he exercise that caution which a person of prudence would ordinarily exercise in like circumstances. Of course, if the instrument or appliance be of such character as to suggest a high degree of danger in its use, the degree of care and caution incumbent on the master to be exercised increases accordingly. The rule is well stated in the decision of this court, in general terms, in *Hoffman v. American Foundry Co.*, 18 Wash. 287, 51 Pac. 385, as follows:

"It is the duty of the master to furnish to the servant reasonably safe tools, machinery and appliances with which to work, and it is the servant's duty to exercise due care to avoid injury. These duties are reciprocal and exist by implication based upon the contract of employment. The implied duty of each is measured by the standard of ordinary care. The law is well settled that the master discharges his duty when he provides machinery that is of ordinary character and reasonably safe. He is not required to provide the newest and best. Employers are not insurers and the law recognizes that absolute safety is unattainable. They are liable for the results of their negligence, and not for the dangers necessarily connected with the service. The risks incident to the employment are assumed by the person accepting such employment,

and in the absence of statutory provision prescribing the kind or character of machinery to be used, or regulating the manner of its use, an employer who uses machinery which is in common and ordinary use in the line of business in which he is engaged cannot be held liable for an accident which might have been prevented by the use of different machinery.''

Applying this rule to the undisputed facts of this case, we cannot escape the conviction that it must be held, as a matter of law, that respondent, through his agents, operating the railway, did all that was required of him in the furnishing of the wedge in question. We have seen that this wedge was one of many thousands furnished with the couplings of this type; that they were all of uniform design and appearance; that none of them, other than this one, so far as known, ever showed the defect or danger in their use claimed by appellant to exist in this one, and that it was purchased by the railway company, or by respondent's agents while in charge of the company's lines, the same as all others were purchased, from a very large and reliable manufacturing concern. The situation is not materially different from what it would be, so far as respondent's negligence is concerned, had the accident occurred from the use in the usual manner, of a common nail. It could hardly be argued with any show of reason that a master furnishing his workmen with nails to be used in the usual manner, which he had purchased from a reliable nail manufacturing concern, would be liable for an injury caused as appellant claims his injury was caused, because of the want of inspection of each nail with a view to determining whether or not it possess a defect as is claimed relative to this wedge. The case here presented is manifestly more favorable to respondent, touching the question of negligence, than where the master makes a

special individual appliance, however simple, and furnishes it to his workmen for use. We need not consider these wedges as simple tools, strictly speaking, but they are manifestly very simple appliances forming a part of the coupler appliance.

In 3 Labatt, Master and Servant (2d ed.), at § 1055, the rule is stated which we conceive to be applicable to the facts in this case as follows:

"Negligence is sometimes inferable from the fact that the purchase or procurement otherwise of the instrumentality was carried out in a careless manner. But in the absence of some special feature of this sort, the extent of the master's responsibility in cases of this type is necessarily determined with reference to the principle that he may rely in some degree upon the assumption that the parties who supplied an instrumentality exercised ordinary diligence in seeing that it was fit for use. All the authorities are agreed that the fact of the appliance being of an approved pattern (see chapter XXXIX, *ante*), and having been bought from a reputable maker, is at least *prima facie* evidence that the defendant was not negligent in requiring his servant to use it. But most of the cases go much further than this, holding that such facts are conclusive in the master's favor in the absence of some circumstance which would put a prudent man upon inquiry at the time of the purchase or afterwards."

These observations of that learned author are in harmony with the rule as adduced by the editors of the note appended to the decision in *Parker v. Hailey-Ola Coal Co.,* 40 L. R. A. (N. S.) 1120, where numerous authorities are collected and reviewed. The rule which absolves a master from negligence, as a matter of law, in the furnishing of a simple tool or appliance to his workmen, when it is of an approved pattern and has been bought by the master from a reputable maker, should, we concede, be limited in its application to tools and appliances which are in fact simple in construction

and the ordinary use of which is not attended with any marked degree of danger. We think the wedge here in question is plainly such a simple appliance.

The decision of the New York Court of Appeals in *Carlson v. Phoenix Bridge Co.*, 132 N. Y. 273, 30 N. E. 750, seems to be a leading case upon this subject. There was involved in that case an injury caused by the breaking of a hook at the end of a tackle used in the lifting of heavy iron girders during construction work. In holding, as a matter of law, that the master was not negligent, the following observations were made in the course of the opinion:

"The immediate cause of the accident which injured the plaintiff was the breaking of the hook when the girder was being raised from the street, and the negligence charged upon the defendant was its failure to furnish a hook strong enough to sustain the weight of the girder.

"The hook in question was one of a number (testified to be eight or more) made for use in the work of building the railway, by a blacksmith in the defendant's employ. They were made about three months prior to the accident from a bar of iron twenty-four feet long and one and three-quarter inches in diameter, purchased by defendant from Manning, Maxwell & Moore, reputable dealers in iron, and ordered as the 'best refined,' which was the best grade of iron in the market. All of the hooks had been used in raising similar heavy girders and none of them were shown to have been weak or insufficient for the work required of them.

"The one in question had been used during the three months previous to the accident to lift about two hundred girders similar to the one which fell upon the plaintiff, and there was nothing in its external appearance to indicate that it was weak or that the material was not of the best quality.

"After the accident the iron at the point of fracture was discovered to be bad. The break was square across the shank and presented a bright appearance, without rust, and the proof tended to the conclusion

that it resulted from crystalization of the iron, which could not be discovered by an external examination. It was not discoverable in the process of making the hook, and when delivered to the employees for use it was supposed to be of the best material. . . .

"Reasonable care and not the highest efficiency which skill and foresight can produce is the measure of the master's liability, and he performs his whole duty by using as much care in the selection of materials for the use of his servants as a man of ordinary prudence in the same line of business would, acting in regard to his own safety, use in supplying similar things for himself were he doing the work. *(Marsh v. Chickering,* 101 N. Y. 390; Shearman & Redfield on Negligence, § 195.)

"A master who puts a tool or implement into his servant's hand may procure it in several ways. He may buy it ready made of a dealer, procure it to be manufactured or purchase the materials and manufacture it himself. Liability for an injury resulting from a defect in the materials of a tool will be determined by the same rule in each case. If a hook like the one used in the present case had been procured ready made in the market or manufactured at a foundry, the defendant would necessarily have been compelled to rely upon the dealer and manufacturer for the quality of materials used. A completed hook ready for use could neither be cut into with a chisel, or bent over an anvil, without impairing its strength, or perhaps destroying it altogether. A test of that character applied to one of a lot would be no guaranty of the quality of the others. To apply such a test, therefore, to tools procured in that way is impracticable, and such articles are not usually tested before they are put in use. The modern industrial system rests upon confidence in others. A railroad corporation cannot well apply such tests to the materials of which its cars and engines are made, or to the rails which form its tracks. Reasonable inspection is necessary and required. But when articles are manufactured by a process approved by use and experience and apparently properly finished and stamped, it is not usual for them to be tested

again in quality, and such examinations are not generally required by law. If materials of the best quality are purchased and tools constructed from them by competent and skillful workmen, if there is nothing in the appearance of the material to indicate inefficiency, men in the ordinary affairs of life use them and place them in the hands of their servants, and there were no circumstances surrounding the manufacture of the hook in question to induce a prudent man to depart from the usual course, or to adopt extraordinary care and precaution."

In *Vanderpool v. Partridge,* 79 Neb. 165, 112 N. W. 318, 13 L. R. A. (N. S.) 668, there was involved the use of a chisel which had been made from an old rasp, a chip flying off the end of it when struck, and injuring the plaintiff's eye. In that case the chisel was caused to be specially made by the master, nor was it one of several that were so made, but a single one. In sustaining the ruling of the trial court directing a verdict for the defendant, the court said:

"From these cases and the many citations therein contained, it is apparent that the master is not liable for injuries resulting from latent defects in simple tools or appliances, such as a hammer, saw, chisel, and the like. The reason for the rule is that any defect in such simple tools or appliances would be as obvious to the servant as to the master, and the underlying reason in all the cases for holding the master accountable for injuries resulting from imperfect or defective tools and appliances is that the servant is ordinarily presumed to have no knowledge of the dangers incident to their use. But, as we have seen, the rule has no application to the simpler tools and appliances."

This language of the Nebraska court was quoted with approval by Judge Gose, speaking for the court, in *Bougas v. Eschbach-Bruce, Co.,* 77 Wash. 347, 137 Pac. 472, wherein there was involved the use of a clamp similar to a clevis, which the master had caused to be

specially made for the purpose it was being used, the court holding that it was such a simple appliance and apparently so suitable for the purpose it was being used, and having served the purpose safely for a time, that the defendant should be absolved from the charge of negligence in furnishing it, as a matter of law. The decisions of this court in *Wilson v. Cain Lumber Co.*, 64 Wash. 533, 117 Pac. 246, and *Paich v. Northern Pac. R. Co.*, 82 Wash. 581, 144 Pac. 919, are in harmony with the conclusions we here reach, though they are not in all respects exactly in point. Our conclusion also finds support in *Lynn v. Glucose Sugar Co.*, 128 Iowa 501, 104 N. W. 577; *Dompier v. Lewis*, 131 Mich. 144, 91 N. W. 152, and *Kansas City & P. R. Co. v. Ryan*, 52 Kan. 637, 35 Pac. 292. The *Lewis* and *Ryan* cases, it is true, are cases wherein a new trial was granted— that is, the cases were not taken from the jury and finally decided by the court as a matter of law, but there were disputed questions of fact involved therein, and a reading of the observations of the courts therein seems to us to render it apparent that, had there been such an undisputed state of facts as exists in the case before us, they would have been decided by those courts, as a matter of law, in favor of the defendants.

Counsel for appellants seem to rely particularly upon the decisions in *Crader v. St. Louis & S. F. R. Co.*, 181 Mo. App. 526, 164 S. W. 678. That case, however, involved the use of a tool furnished by the master which by its very nature was not intended or suitable for the purpose to which it was put, that is, it was not the kind of a tool, aside from the question of its quality, proper to be used. Another decision relied upon by counsel for appellant is that rendered by the second Federal circuit court of appeals in *New York, N. H. & H. R. Co. v. Vizvari*, 210 Fed. 118, L. R. A. 1915 C 9. The instrument there in question was a

chisel furnished to be used for the cutting of steel rails.
While it was a tool of simple construction, its intended
use was of such extraordinary character and fraught
with such danger, by reason of the great amount of
force to be applied to it by blows with a sledge, that the
court declined to regard it as a simple tool, but one the
use of which was attended with such hazards that the
master was charged with a proportionate higher de-
gree of care than when supplying a simple tool for a
use not of such an inherently dangerous character. We
have not overlooked our recent decision in *Randall v.
Gerrick,* 104 Wash. 422, 176 Pac. 675, which may
seem to somewhat modify our holding in *Bougas v.
Eschbach-Bruce Co.,* above noticed. In that case, how-
ever, the instrument furnished for use was in a class
somewhat akin to the one considered by the circuit court
of appeals in the *Vizvari* case just noticed. It was a
riveter tool called a "snap," being a piece of steel,
cup shaped in one end. In riveting, it was placed
over the head of the bolt to be riveted, and held there
by one man while another would strike its outer end
with a sledge, for the purpose of riveting the end of
the bolt. After being used a short time it was noticed
that the snap made the heads of the bolts cone shaped.
The foreman, noticing this, and being desirous of hav-
ing the heads of the bolts made button shaped, direct-
ed that the snap be taken to the blacksmith shop and
changed so that it would accomplish that result. It was
so changed and in the heating it was made brittle, and
upon its return and being put into use, the first blow
from the sledge caused it to break, when a piece flying
from it struck plaintiff in the eye. It was held that
it could not be said, as a matter of law, that the de-
fendant was free from negligence under the simple tool
doctrine. We think that is quite a different situation
than is here in question.

Some other assignments of error are made in form in appellant's brief, but they are presented to us without argument or citation of authorities, and we do not feel called upon to discuss them or to say any more than that we regard them as without merit. Counsel for respondent contend that the evidence shows that the cause of appellant's injury is only a matter of conjecture and speculation, and for that reason the judgment was right. We need not pursue this interesting inquiry, however.

The judgment is affirmed.

HOLCOMB, C. J., TOLMAN, MITCHELL, and MAIN, JJ., concur.